**William C. FUCIK**

v.

**The UNITED STATES.**

No. 282–79C.

United States Court of Claims.

July 29, 1981.

Robert A. Filpi, Chicago, atty. of record, for plaintiff; Stack & Filpi, Chicago, of counsel.

Colvin W. Grannum, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and KASHIWA and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge, delivered the opinion of the court:

This civilian pay case is before us on cross-motions for summary judgment to review a decision of the Federal Employee Appeals Authority (FEAA) of the Civil Service Commission [1] upholding plaintiff's discharge for being absent without leave for 56 consecutive days.[2] We deny both motions and remand the case to the Merit Systems Protection Board (the board) for further consideration.

In June 1968, plaintiff joined HUD as the Director of the Planning Branch of the Office of Program Coordination and Services for Region V. This was a GS–15 level position and plaintiff was stationed in Chicago, Illinois. He held that position until mid-1971 when he was appointed to the position of New Communities Liaison Officer for Region V. This was also a GS–15 position located in Chicago.

In June 1974, plaintiff's position was shifted to Washington, D. C., in a reorganization. Plaintiff accepted a GS–14 position as Acting Regional Director of the Federal Insurance Administration in Chicago rather than transfer. Plaintiff's new position was a supervisory one and he held it for about 3 years. In January 1977, Richard Krimm, a HUD administrator, told plaintiff that he was being reassigned to Washington. This apparently came as a surprise to plaintiff. However, in a later conversation with plaintiff in February of that year, Krimm told plaintiff that he was dissatisfied with plaintiff's performance as a supervisor. On April 11, 1977, Krimm sent a memo to J. Robert Hunter, plaintiff's superior, concerning plaintiff's alleged poor performance.

---

1. The functions of the FEAA have been taken over by the Merit Systems Protection Board (MSPB) following the enactment of the Civil Service Reform Act of 1978, § 202, 5 U.S.C. § 1205 (Supp. III 1979).

2. Plaintiff was removed on May 8, 1978, before January 11, 1979, the effective date of the Civil Service Reform Act of 1978, § 907, 5 U.S.C. § 1101 note (Supp. III 1979), and therefore that Act is inapplicable to this case. *Gaskins v. United States*, Ct.Cl.App. No. 5–79 (order entered October 23, 1979).

Krimm suggested in the memo that, "in lieu of adverse action" being taken against plaintiff, that he be reassigned to a nonsupervisory position as a special assistant to Krimm in Washington. This memo was never made a part of plaintiff's personnel file [3] and plaintiff discovered its existence only by accident. On April 12, 1977, Hunter formally reassigned plaintiff to the special assistant position, effective May 9, 1977. The agency did not provide adverse action procedures to plaintiff in connection with this reassignment.

Plaintiff reported for work in Washington on May 9 but complained that it was creating a hardship for him. He was detailed back to Chicago for a period of 30, 60, or 90 days. He actually stayed 48 days and returned to Washington on July 25, 1977. He found that the duties of his new position were insufficient and complained of this. Hunter asked plaintiff to suggest further duties for the position and plaintiff did so. However, on October 17, 1977, plaintiff stopped reporting for work in Washington and returned to Chicago. Krimm twice advised plaintiff to return to work in Washington or else risk adverse action. After plaintiff had been absent without leave for 56 days, HUD proposed to remove him. The decision to remove plaintiff was made by J. Robert Hunter and, after proper notice, he was removed on May 8, 1978.

Plaintiff sought relief during this period through a number of avenues. First, on April 28, 1977, and again on July 20, 1977, he sought relief from the reassignment through HUD grievance procedures. Relief was denied by final decision dated March 3, 1978.[4] HUD found the reassignment was made in good faith and was not arbitrary or capricious or based on improper determinations. It also found that plaintiff's new position was not a sham or overgraded as plaintiff contended. However, HUD specifically refused to consider plaintiff's argument that the reassignment was a reduction in rank. HUD considered that to be an issue for the Civil Service Commission (CSC).[5]

Plaintiff sought, on September 30, 1977, a CSC audit of the special assistant position to declare it overgraded. On November 21, 1977, the CSC refused on the ground that plaintiff had not worked at the position long enough.

On February 3, 1978, plaintiff appealed to the FEAA on the ground that the reassignment was actually a reduction in rank. On November 16, 1978, the Chicago office of the FEAA denied relief on the ground that there was no reduction in rank since plaintiff's new position was not subordinate to his old position or to a position equivalent to his old position. However, the Chicago office specifically declined to consider whether the special assistant position was overgraded and whether that would cause the reassignment to be a *de facto* reduction in rank.

Finally, on May 17, 1978, plaintiff appealed his removal to the Washington office of the FEAA. He waived his right to a hearing. The FEAA denied relief. It first rejected plaintiff's contention that his removal was procedurally improper because the same official who had ordered the reassignment, J. Robert Hunter, was the one who decided to remove plaintiff. Turning to the merits, the FEAA found (1) HUD had found the reassignment to be in good faith and proper, and (2) the FEAA Chicago office had found there was no reduction in rank. It then concluded: "Since [plaintiff's] reasons for believing that his absence from the position of Special Assistant, Washington, D.C. was justified were not sustained by the appropriate appellate authorities, we find the charge of Absence Without Leave from October 17, 1977 to January 9, 1978, is sustained."

Plaintiff timely filed his petition here on July 2, 1979.

---

3. Plaintiff asserts this violated the Privacy Act, 5 U.S.C. § 552a(e)(5) (1976), although defendant disputes this. However, plaintiff does not assert that this court could give relief for such a violation.

4. Plaintiff asserts that HUD's delay in processing the grievance violated regulations but does not claim that this would entitle him to relief.

5. Plaintiff concedes this was proper.

■ Our scope of review in civilian pay cases is well settled. We will set aside administrative action only if it is found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, without a rational basis, contrary to law, or not in substantial compliance with procedural regulations. *Summers v. United States*, 648 F.2d 1324 (Ct.Cl.1981); *Gaskins v. United States*, 652 F.2d 70 (Ct.Cl.1981); *Boyle v. United States*, 207 Ct.Cl. 27, 34, 515 F.2d 1397, 1401 (1975); *Grover v. United States*, 200 Ct.Cl. 337, 343 (1973); *Morelli v. United States*, 177 Ct.Cl. 848, 858 (1966).

Turning to the merits, we note that plaintiff does not contest that he was absent without leave for 56 straight days nor that normally such a charge would suffice as a basis for dismissal. Rather he asserts by way of defense that his reassignment from Chicago was improper and coerced his absence and therefore his removal was improper. Defendant has not contested that such a defense, if proven, would be adequate to set aside a removal, and we will therefore assume for the purposes of this case that it is an adequate defense. The only issue before us, therefore, is whether plaintiff has established his defense.

Plaintiff's arguments that the reassignment was unlawful can be separated into two main but overlapping parts. The first is that the reassignment was unlawful because it was a reduction in rank taken without prescribed procedural requirements. The second is that the reassignment was unlawful because it was what plaintiff calls a "punitive transfer." We consider those arguments in sequence.

I

■ A reduction in rank is an adverse action. 5 C.F.R. § 752.201(b)(4) (1977) (current version at 5 C.F.R. § 752.301 (1980)). Such action generally may not be taken without providing the employee with adverse action procedures such as notice and an opportunity to reply before the adverse action is taken. 5 C.F.R. § 752.202 (1977) (current version at 5 C.F.R. §§ 752.301, 752.-404 (1980)). In general, where adverse actions are taken by agencies without providing adverse action procedures, the actions are unlawful and may be set aside. *Summers v. United States, supra; Bur v. United States*, 224 Ct.Cl. ——, ——, 621 F.2d 415, 416 (1980); *Shaposka v. United States*, 215 Ct.Cl. 34, 43, 563 F.2d 1013, 1018 (1977); *Gratehouse v. United States*, 206 Ct.Cl. 288, 296, 512 F.2d 1104, 1108 (1975), *cert. denied*, 434 U.S. 955, 98 S.Ct. 480, 54 L.Ed.2d 313 (1977). Since plaintiff was not provided with adverse action procedures in connection with his reassignment, the only question here is whether there was a reduction in rank.

Plaintiff claims there was. He presents his reduction-in-rank argument as a single argument but it actually has two distinct facets, and this has been the cause of some confusion in the case. The first argument we will call the "hierarchical" argument. The second argument we will call the "sham position" argument.

The "hierarchical" argument is that plaintiff was reduced in rank by the reassignment because in the new position he reported to a lower level supervisor than he did in the old position. This argument was based on the face of the position descriptions of the old and new positions and the HUD organizational chart. This was the argument considered by the FEAA's Chicago field office. It held that the new position was not subordinate to the old position nor subordinate to a position equivalent to the old position. It concluded, therefore, that there was no reduction in rank and denied plaintiff relief. However, it expressly refused to consider the "sham position" argument.

In its later decision regarding plaintiff's termination, the FEAA simply relied on the Chicago office's determination that there was no reduction in rank. Plaintiff attacks this as improper, but it is not clear whether he does so because he feels the FEAA cannot rely on the Chicago office decision per se or because by doing so the FEAA failed to consider the "sham position" argument. As to the first point, we do not feel there was anything improper in relying on the

Chicago office decision as to the "hierarchical" issue. It is, after all, the same agency and that issue had not changed. Furthermore, plaintiff does not contend that he presented any new evidence to the FEAA at the termination proceedings as to the "hierarchical" issue which was not presented to the Chicago office. Since the parties agree that the Chicago decision is not before us for review, we think it settled for the purposes of this litigation that the position was not lower in the hierarchy, at least on the basis of the position description. Therefore, there was no reduction in rank on that theory, and it cannot help plaintiff here. The second point we consider presently.

■ The reduction-in-rank argument's second facet is the "sham position" argument. Plaintiff argues that the new position to which he was transferred was in fact a sham, that the position description was wholly inaccurate, and that the position as it actually existed could only be rated far below plaintiff's GS–14 status. If such an allegation were true, the transfer would amount to a reduction in rank. FPM Supp. 752.1 provides in part: [6]

S1–4 Reduction in Rank

a. *Definition.* In law and the Commission's regulations, the term *rank* means something more than a numerical grade, or class, or level under a classification system or its equivalent in the Federal Wage System. Basically, it means an employee's relative standing in the agency's organizational structure, as determined by his official position assignment.[7] (Emphasis in original.)

We take this to indicate that there can be a reduction in rank even where the employee has not been reduced in grade. If plaintiff's new position was overgraded, as he contends, then this transfer would be an instance of reduction in rank without reduction in grade. The consequence would be that plaintiff would have suffered an ad-

verse action without being provided the required procedural safeguards and the rule stated above would still apply. Such action will be set aside as unlawful. *Roskos v. United States,* 213 Ct.Cl. 34, 42–43, 549 F.2d 1386, 1390–91 (1977) (concurring opinion). The issue, again, is simply whether the position was overgraded.

■ We do not find any discussion of this issue in the board opinion however. Plaintiff asserts that the board's failure to address this issue constitutes a harmful procedural error that invalidates the board's action. Our examination of the administrative record, however, indicates that much of the burden for the board's omission rests on plaintiff's shoulders.

We have examined plaintiff's brief before the board and find that this issue was not clearly raised. Plaintiff has vigorously argued the point before us. Indeed, he has made it the major argument of his case. This contrasts sharply with his treatment of the issue before the board. Before us, plaintiff has liberally sprinkled his briefs with the term "sham position." That expression appears nowhere in his brief to the board. In his opening brief to us, plaintiff has devoted over eight consecutive pages solely to trying to demonstrate that the position he was transferred to was a sham. His entire brief to the board was only eight pages long. In it we find only one sentence pertinent to this issue:

* * * Finally, Mr. Fucik presented a letter from Richard Krimm, head of the Office of Flood Insurance, that recognizes that the job of Special Assistant was not a full-time job and that additiona[l] duties would have to be added (Exhibit N (exhibit C) to Attachment 3).

This is all we could find to indicate that plaintiff had argued before the board that the new position was a sham and overgraded, that his transfer was therefore a reduction in rank on that ground, that as a consequence the action was unlawful since

6. FPM Chapter 752 was completely revised September 17, 1980. FPM Letter 752–11. Our citation is to the supplement to the version before revision.

7. Note that it does not refer to the official position description, but to the assignment.

taken without adequate procedural safeguards, and that this constituted a complete defense to the charge of absence without leave. We asked plaintiff's counsel at oral argument to show us where in the administrative record the issue had been raised and he could only point to portions of the large appendix attached to the brief below. Normally, one does not look to an appendix of a brief to find a primary argument. Furthermore, the sentence above-quoted comes at the end of a paragraph dealing with the argument that plaintiff reported to a lower level supervisor.

Since plaintiff has so thoroughly belabored the "sham position" argument before us, we are able to reread plaintiff's brief and appendices before the board and find the allegations and evidence that point towards this issue. However, it would be quite easy for someone presented only with plaintiff's administrative materials to miss the issue and think that plaintiff was asserting only the first part of the reduction-in-rank issue we have discussed above, the "hierarchical" argument. It is not surprising, therefore, that the board felt that plaintiff was raising nothing more than the issue previously disposed of by the Chicago office and so it did not reconsider the matter. The Chicago office decided only the "hierarchical" issue, however, not the "sham position" argument.

■ Normally, when an issue is not raised before the administrative board, it may not be raised in this court. *Leefer v. United States,* 215 Ct.Cl. 1061 (1978); *Haynes v. United States,* 190 Ct.Cl. 9, 418 F.2d 1380 (1969); *Pine v. United States,* 178 Ct.Cl. 146, 149–50, 371 F.2d 466, 467–68 (1967). However, we are reluctant to apply that rule in this case since plaintiff did attempt to raise the issue below, although somewhat inartfully. Rather, we feel the case falls under the rule of *Gratehouse v. United States,* 206 Ct.Cl. 288, 512 F.2d 1104 (1975), *cert. denied,* 434 U.S. 955, 98 S.Ct. 480, 54 L.Ed.2d 313 (1977). There plaintiff partially bore the responsibility for the board's omission from consideration of an issue and failed to alert the board to that

omission by a motion for reconsideration. Plaintiff here has similarly failed to move for reconsideration. The remedy in *Gratehouse* was to remand the case back to the board to consider the issue, with instructions to award the plaintiff back pay from the original date of the termination of his employment should the board find in his favor. We must be careful in application of the *Gratehouse* rule. It is subject to abuse by parties attempting to bypass the board or hoping to get several chances to litigate their cases. Nevertheless, we do not believe there was any conscious abuse here and, accordingly, we think the *Gratehouse* remedy appropriate.

## II

■ Plaintiff's other set of arguments is that the reassignment was unlawful because it amounted to what he calls a "punitive transfer." This argument also has two parts. The first is that the reassignment was taken to avoid adverse action and so it unlawfully circumvented adverse action procedures and is invalid on that ground alone. Plaintiff points to the Krimm memorandum suggesting the reassignment "in lieu of adverse action" as support for this contention. Plaintiff argues that the reassignment was taken because of claims that he was not a good supervisor. He contends that whenever an agency decides to change an employee's position because of asserted deficiencies in performance, it must go through adverse action procedures so that the charges may be aired and the employee has a chance to refute them. We disagree.

Plaintiff cites a number of cases to support his proposition. *Pauley v. United States,* 419 F.2d 1061 (7th Cir. 1969), does not discuss the question of whether a reassignment motivated by an employee's allegedly poor performance to a new position of equivalent grade and pay constitutes an adverse action requiring adverse action procedures. *Roskos v. United States,* 213 Ct.Cl. 34, 549 F.2d 1386 (1977), is similar. It held that the reassignment involved there was either to coerce the employee's resignation or was without rational basis. In ei-

ther event, the reassignment was unlawful and invalid. The proposition of law plaintiff urges was not discussed.

*Kletschka v. Driver,* 411 F.2d 436 (2d Cir. 1969), is a little closer to the mark and may be read to support plaintiff's proposition. However, that case did not involve an adverse action claim, as the case before us, but action pursuant to 38 U.S.C. § 4110 (1976). The court held that statute required a hearing before transferring an employee because of ineptitude. 411 F.2d at 444–45. Adverse action procedures, however, do not apply to mere transfers or reassignments. 5 C.F.R. § 752.201(b) (1977) (current version at 5 C.F.R. § 752.301 (1980)). This point is discussed more fully below. For this reason we feel the *Kletschka* case is inapplicable here.

Finally, plaintiff cites *Motto v. GSA,* 335 F.Supp. 694 (E.D.La.1971), *aff'd without opinion,* 502 F.2d 1165 (5th Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975). There Motto's superior considered him a poor supervisor and wished to get rid of him. However, the superior wished to avoid going through adverse action procedures because the superior felt the evidence was insufficient to indicate charges would succeed. He knew that Motto had twice before refused transfers away from New Orleans, where he was still working, and the superior also knew that Motto would likely again decline a transfer unless he were offered an increase in pay. The superior then ordered Motto transferred to Texas because of "job requirements." As expected, Motto resigned rather than accept the transfer. The court found that the transfer was ordered to induce Motto's resignation and to circumvent adverse action procedures. It held such action unlawful, entitling Motto to relief.

The court's reasoning is not quite clear. First, it may be read to support plaintiff's view. That is, the court may have held that where transfer is ordered because of dissatisfaction with an employee's performance, the transfer is an adverse action, whether or not there is any reduction in rank. Hence, if adverse action procedures are not provided, the action is unlawful. In this, the court seems to be carrying the law of *Kletschka v. Driver, supra,* over to the area of adverse actions. Another way to read the case is that where a transfer is designed to force the employee's resignation, the action is improper and may be set aside. While we would follow the *Motto* court as to this second view of the law, we would not follow it as to the first.

"Adverse action" does not mean any action which an employee does not like. Rather, it is a technical term that includes only a small number of actions: termination, reduction in rank or pay, suspension, and furlough without pay. 5 C.F.R. § 752.201(b) (1977) (current version at 5 C.F.R. § 752.301 (1980)). Note that transfers and reassignments are not among them. The motive of the agency in carrying out its actions is normally not relevant to whether an adverse action has occurred. If the action falls under one of the specified categories, it is an adverse action. If it does not, it is not an adverse action, and so adverse action procedural requirements are not invoked. We would, therefore, not follow an analysis which converted a reassignment without reduction in rank or pay into an adverse action simply because the agency's motive in ordering the transfer was improper.

The motive of the agency is relevant, however, in determining whether agency action is arbitrary, capricious or an abuse of discretion. Such review of agency action goes to its merits. It differs from viewing action as procedurally defective because the action was an adverse action, yet taken without adverse action procedures. Where an employee is reassigned to a position in the hope of coercing his resignation, the action is unlawful and may be set aside even though it is not an adverse action because there has been no reduction in rank or pay. That result follows because the intent of coercing resignation is an unlawful motive for agency action, constitutes bad faith, and is an abuse of discretion.

However, we believe an agency does have a certain amount of discretion in choosing between two courses of action, one which would involve adverse action procedures and one which would not. Hence, it is not necessarily an abuse of discretion to order reassignment rather than adverse action when an employee is perceived to be performing inadequately. We think it entirely permissible for an agency to transfer an employee whom it feels to be a poor supervisor, but otherwise a good employee, from a supervisory to a nonsupervisory position at the same pay and rank without going through adverse action procedures. Of course, the agency's rationale must be bona fide and not mask an intent to coerce the employee's resignation. But where the action is in good faith, there would be no abuse of discretion in ordering reassignment rather than adverse action. Many employees would possibly prefer reassignment rather than lose employment or incur the detrimental mark of an adverse action under such circumstances, even though plaintiff in the instant case seems to contend to the contrary.

■ In short, the mere fact that an asserted deficiency in plaintiff's performance may have motivated the reassignment in this case does not make the transfer an unlawful adverse action. Nor was there necessarily an abuse of discretion in choosing to reassign plaintiff rather than take adverse action against him.

The second part of the punitive transfer argument does attack the transfer on the merits. Plaintiff contends that the transfer was designed to get rid of him and to coerce his resignation. Such bad faith action, if proven, would of course render the action unlawful. The question again is whether such bad faith has been demonstrated in fact.

■ Here we come to a surprising irregularity in the board decision. Instead of reviewing the evidence for itself *de novo*, the board rested on HUD's determination that there was no evidence of bad faith. In

doing so, the board utilized a scope of review narrower than its proper *de novo* scope of review. We fully agree with plaintiff, and defendant, as it must, concedes that failure to apply a *de novo* standard is clear error on the part of the board. *See* 5 U.S.C. § 7701 (1976) (amended 1978, 1979); 5 C.F.R. §§ 772.101–772.312 (1977).[8] It is the board's obligation to consider the cases before it *de novo* without regard to any decision by the agencies that have gone before it.

■ The board's error in this respect would normally suffice to allow plaintiff recovery but not in the instant case. We are of the view that the case falls within the rule of harmless error. *See Green v. United States*, 650 F.2d 285 (Ct.Cl.1980); *Pascal v. United States*, 211 Ct.Cl. 183, 543 F.2d 1284 (1976); *Haynes v. United States, supra; Cohen v. United States*, 177 Ct.Cl. 599, 369 F.2d 976 (1966), *cert. denied*, 387 U.S. 917, 87 S.Ct. 2029, 18 L.Ed.2d 969 (1967). We think that plaintiff had failed to establish a prima facie case of bad faith before the board and therefore the board's failure to consider the matter *de novo* was harmless. It must be recalled that the standard for demonstrating the bad faith of government officials is a very high one. Plaintiff must come forward with well-nigh irrefragable proof to overcome the presumption of good faith. *Wathen v. United States*, 208 Ct.Cl. 342, 527 F.2d 1191 (1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976); *Grover v. United States*, 200 Ct.Cl. 337 (1973); *Knotts v. United States*, 128 Ct.Cl. 489, 121 F.Supp. 630 (1954). We do not believe plaintiff met that standard.

■ Plaintiff has tried to bring himself under the facts of *Motto v. GSA, supra,* by offering us an affidavit to the effect that Richard Krimm, the one who suggested plaintiff's reassignment, knew about plaintiff's prior refusal to accept a reassignment to Washington and knew that the reason was because plaintiff's children lived with his divorced wife in Chicago. This affidavit

---

8. Comparable regulations do not appear in 5 C.F.R. Subchapter B (1980).

is dated July 30, 1980, long after the administrative decision in this case. This does not constitute newly discovered evidence or evidence unavailable to plaintiff at the time of the board proceedings. Hence, it cannot be presented here since it was not presented to the board. *Leefer v. United States, supra; Haynes v. United States, supra; Pine v. United States, supra.* It was not a part of plaintiff's case below and so cannot be considered in determining whether he established a prima facie case of bad faith to the board.

The evidence that is of record reveals not a trace of bad faith. First, whatever may have been the motivations of Richard Krimm, he did not make the decision to reassign plaintiff but only recommended it to Hunter. Although plaintiff characterizes Krimm's memo to Hunter as secret, notably absent from it are any indications that Krimm hoped to get rid of plaintiff, to coerce his resignation, or any other evidence of bad faith. Indeed, it is highly unlikely that if Krimm wished to be rid of plaintiff he would have had him reassigned from Chicago to Washington to be his own assistant. We note that Hunter detailed plaintiff back to Chicago for a period when plaintiff complained that being in Washington was a hardship for him. Furthermore, Krimm and Hunter appeared willing to respond to plaintiff's complaints that his new position had insufficient duties. Finally, Krimm gave plaintiff a number of chances to return to Washington after his absence without leave began before taking action to terminate him.

In sum, there is simply no evidence of bad faith in the record and the board's failure to consider the issue *de novo* was harmless error.

### III

Accordingly, the motions for summary judgment are denied. The case is remanded to the MSPB for further proceedings in conformance with this opinion. The board shall consider whether the transfer was a *de facto* reduction in rank because the new position was overgraded and not truly a GS–14 level position. If so, then plaintiff will be entitled to back pay less offsets required by law and other appropriate relief under the Back Pay Act, 5 U.S.C. § 5596 (1976) (amended 1978, 1979, 1980), from October 17, 1977. The MSPB is not to hold a hearing nor accept any further evidence from the parties. The record previously compiled by the parties before the board shall be the full record for the board's consideration. All matters are to be considered on a *de novo* basis only. Proceedings in this court will be stayed for a period not to exceed 6 months and plaintiff's attorney is designated to inform the court of the status of the proceedings every 90 days. Ct.Cl. Rule 149.