843 F.2d 1368
 Constance HORNER, Director, Office of Personnel Management, Petitioner,
v.
Richard N. SCHUCK and Alfred E. Washington, Respondents,
and
Merit Systems Protection Board, Intervenor.
Constance HORNER, Director, Office of Personnel Management, Petitioner,
v.
H. Anthony JAMES, Jule Hawkins, Robert Lloyd, Jr., Neal
Smith and Norman L. Degrange, Respondents,
and
Merit Systems Protection Board, Intervenor.
 Nos. 86-1723, 87-3184.
 United States Court of Appeals,
Federal Circuit.
 April 6, 1988.
 
 Elizabeth S. Woodruff, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for petitioner. With her on the brief, were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Robert A. Reutershan, Asst. Director. Also on the brief, were James Hicks, Office of Personnel Management, Washington, D.C., R. Andrew German and Suzanne Hassell Milton, Office of Labor Law, Washington, D.C., of counsel.
 Robert F. Laufman, Cincinnati, Ohio, argued for respondents.
 Deborah Stover-Springer, Merit Systems Protection Bd., Washington, D.C., argued, for intervenor. With her on the brief, were Llewellyn M. Fischer, General Counsel, Mary L. Jennings, Deputy General Counsel, Marsha E. Mouyal, Reviewer of Litigation and Rita S. Arendal.
 Before NEWMAN and ARCHER, Circuit Judges, and BALDWIN, Senior Circuit Judge.
 ARCHER, Circuit Judge.
 
 
 1
 In this consolidated appeal, Constance Horner, Director of the Office of Personnel Management (OPM), petitions, pursuant to 5 U.S.C. Sec. 7703(d) (1982), for review of the final decisions of the Merit Systems Protection Board (MSPB or board) in Schuck, et al. v. United States Postal Service, Docket Nos. CH07528410682 and CH07528510070, and James, et al. v. United States Postal Service, Docket Nos. CH07528510638, CH07528510567, CH07528510583, CH07528510598 and CH07528510633. The board held that (a) placement of respondents, who were regular full-time employees that had been given light duty assignments, in nonpay, nonduty status because of lack of work violated the collective bargaining agreement between the United States Postal Service (Postal Service or agency) and the unions representing respondents, (b) that their placement in such status for periods of less than thirty days were furloughs requiring the use of adverse action procedures, and (c) that their placement in such status for periods of more than thirty days were reductions in force requiring the use of reduction in force procedures. We affirm the decisions of the board.
 
 I.
 
 2
 Respondents are full-time regular employees of the Postal Service who, due to non-job related physical conditions, were given temporary or permanent light-duty assignments. Allegedly due to a lack of work within their job restrictions, and not for disciplinary reasons, they were involuntarily placed in nonpay, nonduty status on several occasions in 1984 and 1985. As preference eligible veterans who had completed more than one year of service, respondents appealed these agency actions to the MSPB. 5 U.S.C. Secs. 2108, 7511(a)(1)(B) and 7701 (1982).
 
 
 3
 The Administrative Judges (AJs) in Schuck and James held that placement of respondents in nonpay, nonduty status violated Article 8 of the collective bargaining agreement between the Postal Service and the unions representing respondents. See 39 U.S.C. Sec. 1206 (1982). In addition, they found that the nonpay, nonduty status for periods of less than thirty days constituted furloughs under 5 U.S.C. Sec. 7511(a)(5) (1982) and that the Postal Service failed to use the adverse action procedures required by 5 U.S.C. Sec. 7513 (1982). In James, the AJ found that furloughs of more than thirty days constituted reductions in force under 5 C.F.R. Secs. 351.201(a)(2) and 351.202(a)(1) (1985) and that the Postal Service failed to follow the reduction in force procedures set forth in 5 C.F.R. Part 351 (1985).[1]
 
 
 4
 The full board denied the Postal Service's petitions for review of the Schuck and James initial decisions and also denied the Director of OPM's petitions for reconsideration. The Director then petitioned this court for review pursuant to 5 U.S.C. Sec. 7703(d) (1982). After review was granted, the MSPB moved to intervene, filed its brief in opposition to the petition for review, and requested reconsideration of the order granting review. This court denied MSPB's motion for reconsideration and ordered that the issues raised be addressed on brief, consolidated the Schuck and James appeals, and granted the MSPB's motion to intervene.
 
 II.
 
 5
 The MSPB argues that the Director's petition should be dismissed because (1) the board's decisions were an interpretation of a collective bargaining agreement, not an interpretation of a civil service law, rule, or regulation under the jurisdiction of OPM, (2) the board's decisions would not have "substantial impact" on a civil service law, rule, or regulation, and (3) the cases were "mixed cases" outside this court's jurisdiction since they involved claims of discrimination.
 
 
 6
 The authority of the Director of OPM to seek judicial review of board decisions is set forth in 5 U.S.C. Sec. 7703(d), which states:
 
 
 7
 The Director of the Office of Personnel Management may obtain review of any final order or decision of the Board by filing a petition for judicial review in the United States Court of Appeals for the Federal Circuit if the Director determines, in [her] discretion, that the Board erred in interpreting a civil service law, rule, or regulation affecting personnel management and that the Board's decision will have a substantial impact on a civil service law, rule, regulation, or policy directive. If the Director did not intervene in a matter before the Board, the Director may not petition for review of a Board decision under this section unless the Director first petitions the Board for a reconsideration of its decision, and such petition is denied....
 
 
 8
 The Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. Secs. 1101 et seq., contains no express definition of a "civil service law." In 5 U.S.C. Sec. 2101(1) (1982), however, the civil service is referred to as consisting of "all appointive positions in the executive, judicial, and legislative branches of the Government of the United States, except positions in the uniformed services." The Postal Service is included as an "establishment of the executive branch." 39 U.S.C. Sec. 201 (1982); Bacashihua v. Merit Systems Protection Board, 811 F.2d 1498, 1501 (Fed.Cir.1987). Cf. United States v. Connolly, 716 F.2d 882, 885 (Fed.Cir.1983) (Postal Service is not an "executive department" within the meaning of 5 U.S.C. Sec. 101 (1982)). Moreover, the Postal Reorganization Act (PRA), 39 U.S.C. Sec. 101 et seq., provides in 39 U.S.C. Sec. 1001(b) (1982) that:
 
 
 9
 Officers and employees of the Postal Service ... shall be in the postal career service, which shall be a part of the civil service....
 
 
 10
 Although employees of the Postal Service are generally excluded from coverage of the CSRA, 5 U.S.C. Sec. 2105(e) (1982), a specific exception to that rule is contained in 5 U.S.C. Sec. 7511(a), which states, in pertinent part:
 
 
 11
 (1) "employee" means--
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 (B) a preference eligible in ... the United States Postal Service ... who has completed 1 year of current continuous service in the same or similar positions....
 
 
 15
 The inclusion of preference eligible employees of the Postal Service in the definition of "employee" affords them the procedural rights set forth in Subchapter II of Chapter 75 of Title 5 of the U.S. Code, relating to "Removal, Suspension for more than 14 days, Reduction in Grade or Pay, or Furlough for 30 days or less."
 
 
 16
 In view of the breadth of these provisions, there can be little doubt that preference eligible employees of the Postal Service are to be treated the same as civil service employees. It is arguable that the PRA should be considered a civil service law because of the language of 39 U.S.C. Sec. 1001(b). We need not decide this, however, because it is clear that the board interpreted a civil service law by deciding whether it had authority under 5 U.S.C. Sec. 7511 to apply CSRA principles to the placement of petitioners in a nonpay, nonduty status.
 
 
 17
 Postal employees are bound by the terms and conditions of employment set forth in a collective bargaining agreement negotiated pursuant to the PRA. 39 U.S.C. Secs. 1206 and 1209 (1982). The agreement contains a grievance arbitration process by which disputes as to the interpretation of the agreement may be resolved. Inasmuch as the board considered the scope of its authority to interpret the collective bargaining agreement in light of CSRA principles and the PRA's provisions for dispute resolution, its decisions in Schuck and James involved interpretation of a civil service law. Moreover, in deciding that the agency actions constituted furloughs or reductions in force, the board determined the applicability of 5 U.S.C. Secs. 7511(a)(5), 7512 and 5 C.F.R. Secs. 351.201(a)(2), 351.202(a)(1) and in doing so was engaged in the interpretation of civil service laws and regulations.
 
 
 18
 The MSPB contends that even if the board decisions involved interpretation of a civil service law, 5 U.S.C. Sec. 7701 (1982) and the legislative history of section 7703 demonstrate that the Director lacks authority to seek review unless the law is one that OPM is "responsible" for administering.
 
 Section 7701(d)(1) provides:
 
 19
 In any case in which--
 
 
 20
 (A) the interpretation or application of any civil service law, rule, or regulation, under the jurisdiction of the Office of Personnel Management is at issue in any proceeding under this section; and
 
 
 21
 (B) the Director of the Office of Personnel Management is of the opinion that an erroneous decision would have a substantial impact on any civil law, rule, or regulation under the jurisdiction of the Office; the Director may as a matter of right intervene or otherwise participate in that proceeding before the Board.... (Emphasis added.)
 
 Similarly, Sec. 7701(e)(2) provides:
 
 22
 The Director may petition the Board for a review ... only if the Director is of the opinion that the decision is erroneous and will have a substantial impact on any civil service law, rule, or regulation under the jurisdiction of the Office. (Emphasis added.)
 
 
 23
 The MSPB notes that the Director must allege misinterpretation of a civil service law under the jurisdiction of OPM in order to participate in board proceedings under section 7701 and must intervene in those board proceedings or petition the board for reconsideration before judicial review is requested. The MSPB argues that section 7703(d), therefore, at least implicitly, requires that the civil service law at issue must be one which is under the jurisdiction of the OPM. To interpret section 7703(d) otherwise, according to the MSPB, would be illogical since it would permit the Director to seek judicial review in cases where she could not intervene or request board reconsideration, even though these actions are prerequisites to judicial review.
 
 
 24
 We disagree. The Director's statutory right to seek judicial review is circumscribed only by the terms of section 7703(d) and the court's discretion to evaluate the Director's request for judicial review. Devine v. Levin, 739 F.2d 1567, 1569 (Fed.Cir.1984). Section 7703(d), unlike section 7701, contains no requirement that the law, rule or regulation be one which is "under the jurisdiction of OPM." The MPSB's restrictive interpretation of section 7703 would invest the MSPB with a power not granted to it by Congress--that of determining which civil service laws, rules or regulations are the responsibility of OPM. The Director's interpretation, permitting petitions for review regardless of whether the law, rule or regulation at issue is one specifically under the purview of OPM, would, in contrast, comport with the intent of Congress that the Director play an important role in federal civil service matters. See 5 U.S.C. Sec. 1103(a)(5) (1982). There are sound reasons for Congress to establish in sections 7701 and 7703 different standards for the Director's participation. Under section 7701, the Director's participation before the board is in addition to the respondent agency's participation. Under section 7703(d), the Director has sole authority to seek judicial review of a board decision that is unfavorable to an agency. The Director acts under section 7703 to protect the interests of the respondent agency or to protect the interests of the civil service as a whole.
 
 
 25
 The MSPB contends that the legislative history of section 7703 supports its interpretation limiting the Director's authority to seek judicial review to instances in which OPM is responsible for administering the civil service law at issue. The MSPB notes that the legislative history of section 7703(d) states, and that earlier drafts of that section contained, a comparable restriction:
 
 
 26
 [T]he Director ... may request a review of any final decision or order of the Board involving personnel management laws, rules and regulations for which the Office of Personnel Management is responsible.... (Emphasis added.)
 
 
 27
 S.Rep. No. 969, 95th Cong., 2d Sess. 51, 64, reprinted in 1978 U.S.Code Cong. & Admin.News 2723, 2773, 2786.
 
 
 28
 The first version of section 7703 in both Senate and House bills stated:
 
 
 29
 The Director of the Office of Personnel Management may obtain review of any final order or decision of the Board by filing a petition for judicial review in the United States Court of Appeals for the District of Columbia if the Director disagrees with a legal interpretation by the Board of a law, rule, or regulation involving personnel management and for which said Office has official responsibility. (Emphasis added.)
 
 
 30
 CSRA, S. 2640, 95th Cong., 2d Sess. (1978), and H.R. 11280, 95th Cong., 2d Sess. (1978). However, both Houses subsequently made an identical change to what ultimately became section 7703(d) by deleting the requirement that the "Office [have] official responsibility." The Senate bill, passed on August 24, 1978, provided:
 
 
 31
 The Director of the Office of Personnel Management may obtain review of any final order or decision of the Board by filing a petition for judicial review ... if the Director determines, in his sole discretion, that the Board erred in interpreting a civil service law, rule, regulation, or policy directive affecting personnel management and that the Board's decision will have a substantial impact on a civil service law, rule, regulation, or policy directive.
 
 
 32
 S.Rep. No. 969, 95th Cong., 2d Sess 228 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 2723.
 
 
 33
 The House bill, passed on September 13, 1978, stated:
 
 
 34
 If the Director of the Office of Personnel Management determines, in his sole discretion, that the Board erred in interpreting a civil service law, rule, or regulation, or policy directive affecting personnel management and that the Board's final decision or order will have a substantial impact on any civil service law, rule, or regulation, the Director may file a petition for judicial review....
 
 
 35
 H.R.Rep. No. 1403, 95th Cong., 2d Sess. 311 (1978). The language of the bills indicates the rejection by both the House and Senate of the limitation upon OPM's authority to petition for review of decisions of the board contained in the versions of the bills as first introduced.
 
 
 36
 As a rule, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir.1972)). Given the clear and differing language of sections 7701 and 7703, we conclude that Congress established different standards for OPM's participation in the review of personnel actions, depending on whether it seeks to participate in proceedings before the board or seeks judicial review of board decisions by this court. Moreover, we are unpersuaded that we should reinstate a limitation on the Director's authority which both houses of Congress eliminated.
 
 
 37
 Prior to seeking judicial review, the Director must not only determine that the board decision involves an erroneous interpretation of a civil service law, rule, or regulation affecting personnel management, but must also determine that the decision will have a substantial impact on how such law, rule, or regulation will be interpreted and applied in the future. 5 U.S.C. Sec. 7703(d); S.Rep. No. 969, 95th Cong. 2d Sess. 64, reprinted in 1978 U.S.Code Cong. & Admin.News 2786. The MSPB contends that the decisions in Schuck and James do not meet the "substantial impact requirement." While OPM's assessment of "substantial impact" is not binding on the court, Devine v. Sutermeister, 724 F.2d 1558, 1562 (Fed.Cir.1983), we find it appropriate in this case to exercise our discretionary authority and consider OPM's petition. The board's finding--that the agency actions in these cases violated the collective bargaining agreement and in doing so triggered the procedural protections of the CSRA--is applicable only to postal veterans, because they are the only Postal Service employees who may appeal to the MSPB. See 5 U.S.C. Secs. 7511(a)(1)(B), 7513(d). It is clear, however, that the significance of the board's decisions in Schuck and James is not limited to those employees. The board's interpretation may, and allegedly does, differ from the interpretation of the terms and conditions of employment for non-preference eligible Postal Service employees similarly assigned to temporary or permanent light duty status, as evidenced by the arbitration decisions under the collective bargaining agreement. Thus, veteran and non-veteran employees may potentially have different work hours and other terms and conditions of employment. The alleged inconsistency and its potential effect on employment practices within the Postal Service is sufficient to meet the "substantial impact" requirement. See Cornelius v. Nutt, 472 U.S. 648, 660-61, 105 S.Ct. 2882, 2889-90, 86 L.Ed.2d 515 (1985).
 
 
 38
 Finally, in its opposition to OPM's petition for review, the MSPB contends that even if the Director has properly raised a question involving an erroneous interpretation of a civil service law, rule, or regulation, this court lacks jurisdiction to consider the board's decisions as to three petitioners, Schuck, Washington and James, because theirs are "mixed cases" involving claims of discrimination. The board bases this argument on Williams v. Department of the Army, 715 F.2d 1485, 1491 (Fed.Cir.1983) (in banc ), in which this court stated that "where jurisdiction lies in the district court under 5 U.S.C. Sec. 7703(b)(2), the entire action falls within the jurisdiction of that court and this court has no jurisdiction, under 5 U.S.C. Sec. 7703(b)(1), over such cases." The Williams case, however, was expressly "limited to situations in which the employee is challenging judicially the board's determinations of both the discrimination and the nondiscrimination issues ..." (emphasis added). Here jurisdiction is sought pursuant to section 7703(d), not section 7703(b). Section 7703(d) allows the Director to petition for review of any decision of the board, so long as it involves a potentially erroneous interpretation of a civil service law, rule, or regulation and so long as that interpretation will have a "substantial impact." Section 7703(d) provides that this court is the sole forum in which the Director may seek review of board decisions. Whether, under the rationale of Williams, OPM could be deprived of its right to judicial review under section 7703(d) in a case in which discrimination is involved is a question which we need not decide in this case because the board's determinations of handicap discrimination have not been appealed.III.
 
 
 39
 OPM contends that the board was without jurisdiction over the agency actions taken in Schuck and James, that the decisions improperly interpret a collective bargaining agreement negotiated pursuant to 39 U.S.C. Sec. 1209, and that the decisions will adversely impact the Postal Service's administration of its labor relations program pursuant to the PRA.
 
 
 40
 OPM argues that where an agency places employees in a nonpay, nonduty status in accordance with the conditions of their employment, the decision is not subject to review by the MSPB. It bases this argument on Strickland v. Merit Systems Protection Board, 748 F.2d 681 (Fed.Cir.1984), and National Treasury Employees Union v. United States Merit Systems Protection Board, 743 F.2d 895 (D.C.Cir.1984), which held that seasonal employees, who are hired on a temporary basis, were not furloughed within the meaning of 5 U.S.C. Sec. 7511(a)(5) because their employment agreement provided for layoff without pay. Since, in OPM's view, there was no adverse action, it argues the MSPB had no jurisdiction to hear these appeals.
 
 
 41
 In Horner v. Andrzjewski, 811 F.2d 571 (Fed.Cir.1987), this court reversed an MSPB decision and upheld an OPM regulation, 5 C.F.R. Sec. 752.404(d)(2), which permitted agencies to furlough employees without notice or opportunity for reply under certain emergency conditions. However, the court remanded for a determination by the MSPB of whether the regulation was properly invoked under the circumstances of the case, stating:
 
 
 42
 The issue of the propriety of use of the emergency furlough regulation is an open question here. For the protection of employees, precipitous action which deprives them of their livelihood must be restricted to very narrow circumstances.
 
 
 43
 811 F.2d at 577. Thus, the court held that even though agencies may be permitted by federal regulations to furlough employees without notice, the MSPB has jurisdiction to determine whether the regulations were properly invoked. We conclude for similar reasons that, even if the Postal Service may place employees having temporary or permanent light duty assignments in nonpay, nonduty status, the MSPB has jurisdiction to determine whether respondents were properly laid off in accordance with federal regulations and the terms of the collective bargaining agreement, i.e., because of a lack of work. See also National Treasury Employees Union, 743 F.2d at 912 (if employee can show that furlough was not in accordance with the terms of his appointment, employee is entitled to invoke section 7513's adverse action procedures).
 
 
 44
 In determining whether the agency's actions were in accordance with the terms of respondents' employment, the following provisions of the collective bargaining agreement are pertinent.[2]
 
 ARTICLE 8
 HOURS OF WORK
 
 45
 Section 1. Work Week.
 
 
 46
 The work week for full-time regulars shall be forty (40) hours per week, eight (8) hours per day.... Shorter work weeks will, however, exist as needed for part-time regulars.
 
 
 47
 * * *
 
 
 48
 * * *
 
 
 49
 Section 3. Exceptions.
 
 
 50
 The above shall not apply to part-time employees.
 
 
 51
 Part-time employees will be scheduled in accordance with the above rules, except they may be scheduled for less than eight (8) hours per service day and less than forty (40) hours per normal work week.
 
 
 52
 * * *
 
 
 53
 * * *ARTICLE 13
 
 
 54
 ASSIGNMENT OF ILL OR INJURED REGULAR WORK FORCE EMPLOYEES
 
 
 55
 Section 3. Local Implementation.
 
 
 56
 * * *
 
 
 57
 * * *
 
 
 58
 B. Light duty assignments may be established from part-time hours, to consist of 8 hours or less in a service day and 40 hours or less in a service week. The establishment of such assignment does not guarantee any hours to a part-time flexible employee.
 
 
 59
 C. Number of Light Duty Assignments. The number of assignments within each craft that may be reserved for temporary or permanent light duty assignments, consistent with good business practices, shall be determined by past experience as to the number of reassignments that can be expected during each year, and the method used in reserving these assignments to insure that no assigned full-time regular employee will be adversely affected, will be defined through local negotiations. The light duty employee's tour hours, work location and basic work week shall be those of the light duty assignment and the needs of the service, whether or not the same as for the employee's previous duty assignment.
 
 Section 4. General Policy Procedures
 
 60
 A. Every effort shall be made to reassign the concerned employee within the employee's present craft or occupational group, even if such assignment reduces the number of hours of work for the supplemental work force.
 
 
 61
 * * *
 
 
 62
 * * *
 
 
 63
 C. The reassignment of a full-time regular or part-time flexible employee to a temporary or permanent light duty or other assignment shall not be made to the detriment of any full-time regular on a scheduled assignment or give a reassigned part-time flexible preference over other part-time flexible employees.
 
 
 64
 D. The reassignment of a full-time regular or part-time flexible employee under the provisions of this Article to an agreed-upon light duty temporary or permanent or other assignment within the office, such as type of assignment, area of assignment, hours of duty, etc., will be the decision of the installations head who will be guided by the examining physician's report, employee's ability to reach the place of employment and ability to perform the duties involved.
 
 
 65
 * * *
 
 
 66
 * * *
 
 
 67
 The agency contends that these provisions do not guarantee respondents employment for eight hours a day or forty hours a week, but merely provide them employment when work is available within their job restrictions. The AJs noted, however, that Article 8, Section 3, lists employees excepted from the forty hour work week and eight hour day and that full-time regular employees assigned to light duty are not included in that list. They further noted that Article 13, Section 3.B, does not provide that full-time employees are subject to a reduced work schedule while in a light duty assignment, although it does expressly provide that part-time flexible employees are not guaranteed any work hours in a light duty assignment. Although they found that Article 13, Section 3.C, gives the agency discretion to change the tour of duty, work location, and days of work in a light duty assignment, they found that it does not give the agency discretion to change the number of hours the employee is to work each day or week. Finally, they determined that Article 13, Section 4, merely precludes the agency from making a light duty assignment to the detriment of a full-time regular employee, and that it does not modify the provision in Article 8 that full-time regular employees are entitled to forty hours of work per week and eight hours of work per day. The AJs, therefore, properly concluded that the plain language of the agreement does not provide support for the agency's contention that it is entitled to place respondents in nonpay, nonduty status whenever work is unavailable within their job restrictions. Mindful that questions of contract interpretation are questions of law and are thus freely reviewable, Bonner v. Merit Systems Protection Board, 781 F.2d 202, 205-06 (Fed.Cir.1986), quoting Letenyei v. Department of Transportation, FAA, 735 F.2d 528, 531 (Fed.Cir.1984) (interpreting provision of collective bargaining agreement), we discern no error in the board's independent interpretation of the agreement.
 
 
 68
 The Director contends that the board had no authority to interpret the collective bargaining agreement independently in the face of a letter, signed on May 26, 1983, which related to a class action grievance and allegedly memorialized a settlement agreement between the parties. The letter stated that the parties "agree that there is no guaranteed amount of work hours for employees in a light duty assignment." Review of the letter reveals, however, that the parties also agreed that no "national interpretative issue" was involved, and that resolution of the case required development of the "specific fact circumstances involved." Moreover, the letter contains no indication of whether the employees were full-time regular or part-time employees. Thus, the letter fails to establish that the Postal Service and the unions representing respondents entered into an agreement regarding work hours for full-time regular employees who accept light duty assignments.
 
 
 69
 The Director also asserts that the board, like the courts, is prohibited from overturning an arbitrator's award except in limited situations, United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The Director argues that arbitration decisions have uniformly held that employees on light duty are not guaranteed a forty hour work week or an eight hour day and that the MSPB had no authority to interpret the agreement as it did in the face of contrary interpretations reached through the grievance arbitration procedures. As support, the Director cites the following arbitration decisions: United States Postal Service v. American Postal Workers Union, AFL-CIO, Case No. H1C-3T-C-18210 (June 25, 1984) (Mittenthal, Arb.); United States Postal Service v. American Postal Workers Union, Detroit District Area Local, Case No. C1C-4B-C 1914 (Nov. 15, 1982) (Seidman, Arb.); United States Postal Service v. National Association of Letter Carriers, Case No. S8N-3Q-D-21479 (March 2, 1981) (Williams, Arb.); United States Postal Service v. American Postal Workers Union, AFL-CIO, Case No. 5 CPO 245 (Jan. 22, 1980) (Feldman, Arb.); and National Post Office Mail Handlers v. United States Postal Service, Case No. C4M-4F-C 7355 (Nov. 4, 1985) (Walt, Arb.).
 
 
 70
 While dicta in the Feldman, Mittenthal and Seidman decisions supports the Director's contention, the actual holdings of these cases were directed to other issues and, therefore, were not binding on the MSPB. The Williams and Walt decisions were also not binding because they pertain to other unions and other union agreements. In any event, the board has authority to interpret the provisions of a collective bargaining agreement. See Letenyei v. Department of Transportation, FAA, 735 F.2d at 531. See also Leazenby v. United States Postal Service, 8 MSPB 75, 3 M.S.P.R. 384 (1981), and Stalkfleet v. United States Postal Service, 6 MSPB 536, 538, 8 M.S.P.R. 384 (1981).
 
 
 71
 Respondents in this case are not restricted to one avenue of appeal. They may choose between the grievance arbitration process established by the collective bargaining agreement or they may appeal to the board. 39 U.S.C. Sec. 1005; 5 U.S.C. Secs. 7511(a)(1), 7513(d); Bredehorst v. United States Postal Service, 677 F.2d 87, 230 Ct.Cl. 399 (1982); Article 16 of the collective bargaining agreement. If respondents, as preference eligible veterans, choose to exercise their statutory right of appeal to the board, it is the obligation of the board to consider their cases de novo. 5 U.S.C. Sec. 7701(a); 5 C.F.R. Sec. 1201.111(b) (1987); Fucik v. United States, 655 F.2d 1089, 228 Ct.Cl. 379 (1981).
 
 
 72
 United Paperworkers International Union v. Misco, Inc., --- U.S. ----, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), cited by the Director as requiring the board to defer to interpretations reached through the grievance/arbitration process, is inapposite. In that case the arbitration decision was the subject of the appeal, whereas in this case it is urged that deference be given to other arbitration holdings. To require the board to defer to arbitration decisions involving other employees or other union contracts would nullify the individual right of each respondent to appeal to the board. Both the PRA and the collective bargaining agreement recognize that a preference eligible's appeal right to the MSPB cannot be modified. 39 U.S.C. Sec. 1005(a)(2) provides:
 
 
 73
 The provisions of title 5 relating to a preference eligible ... shall apply to an ... employee of the Postal Service in the same manner and under the same conditions as if the ... employee were subject to the competitive service under such title. The provisions of this paragraph shall not be modified by any ... collective-bargaining agreement entered into under chapter 12 of this title.
 
 
 74
 Article 16, Section 9, of the collective bargaining agreement similarly provides:
 
 
 75
 A preference eligible is not hereunder deprived of whatever rights of appeal such employee may have under the Veterans' Preference Act; ....
 
 
 76
 Thus, it is clear that the scope of the board's review on appeal cannot be curtailed by prior unrelated arbitration decisions.
 
 
 77
 Even assuming the board improperly interpreted the agreement, the agency's actions were nevertheless improper with respect to the respondents in James because the agency failed to carry its burden of establishing that on the dates in question it lacked sufficient work for those respondents to perform within their work restrictions. The board specifically found that the agency made no effort to place these respondents in other positions within the mail handlers craft which were encumbered by supplemental work force employees, in violation of Article 13, Section 4.A, of the collective bargaining agreement, which states:
 
 
 78
 Every effort shall be made to reassign the concerned employee within the employee's present craft or occupational group, even if such assignment reduces the number of hours of work for the supplemental work force. After all efforts are exhausted in this area, consideration will be given to reassignment to another craft or occupational group within the same installation.
 
 
 79
 The agency has not pointed to any error in those findings.
 
 
 80
 For the reasons given above, we affirm the decisions of the MSPB.
 
 
 81
 AFFIRMED.
 
 
 
 [1]
 The AJs also determined that respondents Schuck, Washington, and James were qualified handicapped employees who were not reasonably accommodated and, therefore, were subjected to handicap discrimination in violation of 5 U.S.C. Sec. 2302(b)(1)(D) (1982). These determinations have not been appealed
 
 
 [2]
 The language quoted above comes from the 1984-1987 Collective Bargaining Agreement. This appears to be the agreement at issue, since the agency actions took place in 1984 and 1985. In any event, the 1984-1987 Agreement does not differ in any substantive respect from the 1978 National Agreement quoted in the Schuck initial decision, see Appendix to Brief for Petitioner, 90 n. 1, or the Mail Handlers National Agreement cited in the James initial decision, see Appendix to Supplemental Brief for Respondent H. Anthony James, 4 n. 3